ANDREA T. MARTINEZ, Acting United States Attorney (7226)
MELINA SHIRALDI, Assistant United States Attorney (13110)
JEFFREY E. NELSON, Assistant United States Attorney (2386)
Attorneys for the United States of America
111 South Main St., Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Melina.Shiraldi@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| RUBI GARCIA, individually and on behalf of her minor child, A.H.G.,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES of AMERICA,<br><br>Defendant. | **UNITED STATES' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00416-CW-DBP<br><br>District Judge Clark Waddoups<br>Magistrate Judge Dustin B. Pead |

Pursuant to FED. R. CIV. P. 56, the United States of America moves for summary judgment dismissing Plaintiff Rubi Garcia's complaint with prejudice. The basis for this motion is that Ms. Garcia failed to submit her administrative tort claim within two years of the accrual of her claim, as required by the statute of limitations applicable to the Federal Tort Claims Act ("FTCA").

### BACKGROUND

On August 18, 2015, Ms. Garcia gave birth to her daughter, A.H.G., in the University of Utah Hospital. In the immediate aftermath of the delivery, however, Ms. Garcia noticed that

A.H.G. was not moving her right arm. A.H.G. was diagnosed as having suffered an injury to the nerves leading from her spine to her right arm.

A.H.G. was delivered by Keith Horwood, MD, a family-medicine physician employed by Community Health Centers, Inc. ("CHC"). Dr. Horwood and other designated employees of the CHC are deemed to be employees of the U.S. Public Health Service for purposes of medical-malpractice claims under the FTCA. *See* 42 U.S.C. § 233(a).

After A.H.G. was born, Ms. Garcia began taking her to therapy treatments to improve the strength and motion of her right arm. At about five months of age, A.H.G. underwent nerve graft surgery in a further effort to improve the function of her right arm. While there has been improvement, A.H.G. continues to have limitations in the use of her right arm.

Ms. Garcia alleges that Dr. Horwood failed to exercise proper care in delivering A.H.G., resulting in her injury. The United States denies that Dr. Horwood was negligent.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. A.H.G. was Ms. Garcia's fourth child. *See* Garcia dep. (Ex. A hereto) at 8:3–7. Ms. Garcia gave birth to a son in 2005 and a daughter in 2006. *Id.* at 11:2–19. Ms. Garcia and Alejandro Hernandez, the children's father, lived in North Carolina when those babies were born. *Id.*

2. Ms. Garcia and Mr. Hernandez were subsequently married and moved to Utah, where Ms. Garcia gave birth to another son in 2012. *Id.* at 7:8–19, 12:14–25. Physicians employed by the CHC provided prenatal care and delivered Ms. Garcia's son in 2012. *Id.*

3. Ms. Garcia again received prenatal care at the CHC during her fourth pregnancy in 2015. *See* prenatal chart (Ex. B). Her estimated date of delivery was calculated to be August 17, 2015. *Id.*.

4. Ms. Garcia felt contractions in the morning of August 18, 2015, and went to the University of Utah Hospital. Ex. A at 17:1–9.

5. Ms. Garcia's labor proceeded through the afternoon of August 18, and she began the second (pushing) phase of her labor at 5:39 p.m. *See* OB delivery note (Ex. C) at 46. Dr. Horwood was assisted during this phase by Jennifer Eggebroten, MD, the chief obstetrics resident. *See* Horwood dep. (Ex. D) at 36:10–22.

6. At 5:57 p.m., A.H.G.'s head emerged. *See* Ex. C at 46. Dr. Eggebroten attempted to guide the baby out but was unable to do so. Ex. D at 38:16–23.

7. Dr. Horwood then took over the delivery because he suspected the baby was experiencing a shoulder dystocia. *Id.* at 39:4-40:25. This is a condition in which the baby's shoulder is stuck on the mother's pelvic structure, impeding the delivery. *Id.* at 11:19–12:2. The pediatric team was called to be available in case there was a need to resuscitate the baby after delivery. *Id.* at 39:4–19, 96:22-97:3.

8. Dr. Horwood asked assisting personnel to employ the McRoberts maneuver and to apply suprapubic pressure[1] in an effort to free the impacted shoulder and deliver the baby, but the baby still could not be delivered. *Id.* at 38:16-39:1.

---

[1] In the McRoberts maneuver, the laboring mother's legs are pulled back toward her abdomen to widen the opening in her pelvic structure and provide more room for the baby to emerge. Suprapubic pressure is applied by an assistant who places their hand just above the laboring

3

9. Dr. Horwood then manually rotated the baby's shoulders, which freed the impacted shoulder and allowed the baby to be delivered. *Id.* at 47:13-48:3. The maneuvers Dr. Horwood employed took less than a minute to complete, and A.H.G. was delivered at 5:58 p.m. *Id.* at 95:6-96:2; Ex. C at 47.

10. Mr. Hernandez was present with his wife during her labor, and he observed the baby's delivery. *See* Hernandez dep. (Ex. E) at 7:13–19.[2] It appeared to Mr. Hernandez that Dr. Horwood pulled on the baby's right shoulder as he was delivering her. *Id.* at 10:6-12:6.

11. After A.H.G. was delivered, the pediatric team took her to the nursery for examination. Ex. D at 68:17-69:6. The attending personnel noted minimal movement of A.H.G.'s right arm, consistent with a brachial plexus injury.[3] *See* WBN/ICU history and physical (Ex. F) at 8.

12. When A.H.G. was returned from the nursery, Ms. Garcia and Mr. Hernandez both noticed that her right arm appeared to be injured. Ex. A at 23:20–25; Ex. E at 13:15–19.

13. Hospital personnel told Ms. Garcia that they would schedule an appointment for A.H.G. to begin therapy treatments for her right arm. Ex. A at 24:7–23.

14. After Ms. Garcia and Mr. Hernandez returned home from the hospital, Mr. Hernandez told Ms. Garcia that he saw Dr. Horwood pull on A.H.G.'s right shoulder as he was

---

mother's pubic bone, where the baby's shoulder is impacted, and applies pressure in an effort to free the shoulder and allow the baby to be delivered.

[2] Mr. Hernandez is mistakenly identified as Alejandro Garcia in the deposition transcript.

[3] The brachial plexus is a group of nerves that emerge from the spinal cord and carry motion and sensory signals from the spinal cord to and from the arm. The injury occurs when one or more of the nerves are stretched or torn. This can result in temporary or permanent loss of strength and motion in the arm, a condition known as Erb's palsy.

delivering her. Ex. A at 30:1–18; Ex. E at 15:15-16:3. Mr. Hernandez told Ms. Garcia that he thought this had caused A.H.G.'s injury. Ex. A at 30:7–18; Ex. E at 15:8-16:3.

15. On September 1, 2015—two weeks after A.H.G. was born—Ms. Garcia took her to the first of a series of therapy treatments for her right arm. *See* occupational therapy report (Ex. G) at 23; Ex. A at 26:21-28:9. The therapist recorded, "[A.H.G.'s] mother provided the following history. [A.H.G.] was born at 40 weeks following a normal pregnancy and delivery. Mother reports that during delivery [A.H.G.'s] right arm was pulled or stretched and has not been moving at all." Ex. G at 23.

16. On November 18, 2015, Ms. Garcia met with Carla Henkel, a service provider with Early Intervention Services at the Jordan Valley Development Center. *See* Early Intervention report (Ex. H). Ms. Henkel spoke with Ms. Garcia and recorded, "Mom has concerns about [A.H.G.'s] right arm that was pulled at birth and is not moving it very much." *Id*.

17. On January 29, 2016, Ms. Garcia met with Mark Mahan, MD, a surgeon who specializes in the repair of nerve injuries, to discuss surgical options for A.H.G. *See* progress note (Ex. I) at 129. Dr. Mahan recorded, "The mother states that the father witnessed tugging on the right shoulder during delivery. Immediately after birth, her right arm was 'hanging at the side' per the mother's report." *Id.* Ms. Garcia decided to proceed with surgery. *Id.* at 130.

18. A.H.G. underwent surgery on February 3, 2016. *See* discharge summary (Ex. J). The surgery involved harvesting nerve segments from A.H.G.'s lower legs and grafting them along A.H.G.'s injured brachial plexus nerves with the goal of improving the transmission of nerve impulses to her right arm. *Id.* at 66–67.

19. On February 15, 2016—11 days after A.H.G.'s surgery—Ms. Garcia signed an "Identification of Counsel," which identified "KRAMER LAW GROUP as my attorneys, who represent[ ] my legal interests resulting from an injury sustained on 08/18/2015." *See* Identification of Counsel (Ex. K).

20. Ms. Garcia also signed a form dated February 15, 2016, authorizing disclosure of A.H.G.'s medical information to the Kramer Law Group. *See* medical release (Ex. L).

21. The following day, February 16, 2016, Ms. Garcia signed a form provided by the University of Utah Hospital authorizing the release of records regarding her treatment at the hospital on the day of A.H.G.'s birth. *See* medical release (Ex. M).

22. On March 29, 2016, the Kramer Law Group faxed a copy of the medical release form to the University of Utah Hospital, requesting medical records relating to A.H.G.'s treatment at the hospital on August 18, 2015, the day of her birth. *See* records request (Ex. N).

23. On October 13, 2017, the Kramer Law Group mailed to Dr. Horwood and Community Health Centers, Inc., an Amended Notice of Claim and Amended Notice of Intent to Commence Action, notifying them that Ms. Garcia intended to bring a medical malpractice action against them arising from the brachial plexus injury A.H.G. suffered when she was born. *See* Amended Notice of Claim (Ex. O).[4] The notice was filed with the Utah Department of Professional Licensing pursuant to Utah law governing the prelitigation process that is a condition for filing a medical malpractice lawsuit. *Id.* at 1–2.

---

[4] The United States' understanding is that the amended notice added the CHC and Dr. Horwood, who were not named as respondents in the original notice of claim against the University of Utah Hospital and the State of Utah.

24. The Department of Health and Human Services ("HHS") responded to the Amended Notice of Claim with a letter to Ron Kramer of the Kramer Law Group dated November 22, 2017. *See* HHS letter (Ex. P). The letter advised Mr. Kramer that, to the extent Ms. Garcia intended to assert a claim arising from the acts or omissions of practitioners who were deemed to be federal employees, she was required to exhaust her administrative remedy under the FTCA by first submitting an administrative tort claim to the appropriate federal agency. *Id*. The letter further advised Mr. Kramer that "an administrative tort claim must be filed with the appropriate federal agency <u>within two years</u> from the date such claim accrues or it shall be forever barred. 28 U.S.C. § 2401(b). . . . According to our Agency records, **no administrative tort claim has been filed in this matter on behalf of Rubi Garcia or [A.H.G.].**" *Id.* (emphasis in original).

25. Mr. Kramer signed a Claim for Damage, Injury, or Death (the "administrative claim") dated June 14, 2018, addressed to HHS. *See* administrative claim (Ex.Q). The administrative claim identified Rubi Garcia as the claimant who was asserting a tort claim for injuries suffered by A.H.G. on August 18, 2015, when Dr. Horwood delivered her. *Id.*

## ARGUMENT

**I.    Legal Framework**

Tort claims against the United States are governed by the FTCA's two-year statute of limitations: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ."

28 U.S.C. § 2401(b). If a claimant fails to present her claim within two years after its accrual, any subsequent lawsuit asserting the claim must be dismissed. *Dahl v. United States*, 319 F.3d 1226, 1228 (10th Cir. 2003).[5]

      The FTCA's statute of limitations reflects "a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (citation omitted). The statute protects both the government and the courts "from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *Id.*

      In the medical-malpractice context, an FTCA claim accrues "when a claimant knows of the existence and the cause of [her] injury." *Gustavson v. United States,* 655 F.2d 1034, 1036 (10th Cir. 1981). This does not mean that the statute begins to run only when the claimant discovers that the injury was *negligently* caused by the health-care practitioner. *Id.* at 1037. Rather, the claim accrues when a reasonable person in the claimant's position would have reason to suspect that the injury was caused by the practitioner's actions or inactions. *Id.* at 1036 (citing *Kubrick*, 444 U.S. at 122). At that point, the two-year statute begins to run, and the claimant bears the burden of determining whether the facts support a malpractice lawsuit. *Id.* at 1037.

---

  [5]  Subsequent to the *Dahl* decision, the Supreme Court held that § 2401(b) is a statute of limitations, not a part of the government's waiver of sovereign immunity. Thus, the failure to timely submit an administrative claim does not deprive the court of subject-matter jurisdiction over the claimant's action. *United States v. Kwai Fun Wong*, 575 U.S. 402, 410–12 (2015).

**II.    Ms. Garcia's claim for A.H.G.'s injury accrued shortly after A.H.G.'s birth, when Ms. Garcia knew of A.H.G.'s injury and its potential connection with Dr. Horwood's delivery of her.**

Both Ms. Garcia and Mr. Hernandez testified that they knew A.H.G.'s arm was injured as soon as A.H.G. was brought back to them from the nursery. After they arrived home from the hospital, Mr. Hernandez told Ms. Garcia that he believed A.H.G.'s injury was caused by Dr. Horwood's pulling on her right shoulder during the delivery.

Ms. Garcia confirmed her understanding of A.H.G.'s injury in subsequent encounters with health-care personnel. At A.H.G.'s first therapy session—two weeks after A.H.G. was born—Ms. Garcia told the therapist that "during [the] delivery A.H.G.'s right arm was pulled or stretched and has not been moving at all." Ms. Garcia related the same history of A.H.G.'s injury at her first visit with Early Intervention Services in November 2015 and at her meeting with Dr. Mahan in January 2016, prior to A.H.G.'s nerve-graft surgery.

Because Ms. Garcia knew that A.H.G. had suffered an injury at birth and that there was a potential causal connection with Dr. Horwood's actions in delivering her, Ms. Garcia's claim on behalf of A.H.G. accrued shortly after her birth. At that point, Ms. Garcia had two years—until August 2017—to investigate the claim, determine whether she had a basis for a malpractice action and, if so, submit a written claim to HHS. Instead, her claim was not submitted until June 14, 2018, almost 10 months after the two years had expired.

The Tenth Circuit demonstrated the application of this principle in *Arvayo v. United States,* 766 F.2d 1416 (10th Cir. 1985). Ms. Arvayo took her five-month-old son to the hospital at McConnell Air Force Base because he had been fussy and had a fever for nine days. *Id.* at

9

1417. The doctor who saw the infant diagnosed an upper respiratory infection and recommended that Ms. Arvayo give him cold medicine and return in a week if he didn't improve. *Id.*

The following day, Ms. Arvayo returned with her son because his eyes were crossed and he had begun suffering convulsions. *Id.* The doctor who saw the infant this time diagnosed probable bacterial meningitis and immediately transferred him to a civilian hospital for specialized care. *Id.* at 1417–18. Ms. Arvayo was advised that her son was probably suffering from bacterial meningitis and that it could result in brain damage. *Id.* at 1418, 1422.

About two and a half years later, Ms. Arvayo consulted an attorney about concerns regarding the insurance coverage for her son's medical expenses. *Id.* at 1418. The attorney advised Ms. Garcia that the first doctor's delay in diagnosing bacterial meningitis may have caused her son to suffer the brain injury. *Id.* Ms. Arvayo and her husband retained the attorney and filed an administrative claim four months later, which was nearly three years after the events at the Air Force hospital. *Id.*

After the Arvayos filed suit, the United States argued that they had failed to submit their administrative claim within two years of the accrual of their claim. *Id.* The district court disagreed, holding that the Arvayos' claim did not accrue until Ms. Arvayo learned from her attorney of the possible connection between the delayed diagnosis and her son's brain injury. *Id.*

On appeal, the Tenth Circuit reversed, rejecting the district court's analysis of the accrual issue. *Id.* at 1422–23. The court of appeals emphasized that the standard for accrual does not allow a prospective claimant to wait passively for information supporting a claim, noting that such a rule "could possibly toll the statute indefinitely." *Id.* at 1422. Instead, once the claimant is aware of an injury and its potential link to the care rendered, they have two years in which to

inquire as to both causation and negligence and to decide whether to pursue litigation. *Id.* at 1421. In the Arvayos' case, the court held that a reasonable person would have begun that investigation after receiving very different diagnoses of their son's condition within two days, followed by a serious illness and likely brain damage. *Id.* at 1422. Thus, the administrative claim the Arvayos filed almost three years later was not timely. *Id.*

In a case based on facts very similar to those of the present case, the Seventh Circuit recently upheld the dismissal of a claim because it was untimely. In *P.W. by Woodson v. United States*, 990 F.3d 515 (7th Cir. 2021), Ms. Woodson gave birth to a baby boy after a difficult labor and delivery. *Id.* at 518. She claimed that her baby "got stuck on the way out" and had to be "yanked" out "with great force." *Id.* Ms. Woodson noticed immediately after the delivery that something was wrong with her son's left arm, which "just sagged down to his side." *Id.* The delivery occurred on December 7, 2013, but Ms. Woodson did not submit an administrative claim until February 19, 2016, over two years after the delivery.

The Seventh Circuit held that Ms. Woodson's claim on behalf of her son accrued shortly after he was born. *Id.* at 520. The court emphasized the fact that immediately after the delivery—when she alleged her baby had been "yanked" out—Ms. Woodson recognized that her son's arm was injured. *Id.* The court rejected Ms. Woodson's argument that at that point she lacked sufficient information for her claim to accrue. "Ms. Woodson did not need specific information showing that [the doctor who delivered the baby] caused the injuries. . . . Ms. Woodson had enough information shortly after she gave birth to P.W. to prompt her to inquire whether the manner of delivery caused P.W.'s injury." *Id.* at 521.

The reasoning in *Woodson* applies squarely to the present case. Ms. Garcia and Mr. Hernandez both realized that A.H.G.'s arm was injured shortly after she was delivered. After they arrived home, Mr. Hernandez told Ms. Garcia that he believed A.H.G.'s injury occurred when Dr. Horwood pulled on her shoulder during the delivery. Ms. Garcia consistently told the practitioners who treated A.H.G. that her injury was related to Dr. Horwood's pulling, tugging, or stretching of A.H.G.'s shoulder during the delivery. Once Ms. Garcia knew of the injury and its potential connection with Dr. Horwood's delivery maneuvers, her claim accrued and she had two years to seek advice in the legal and medical communities to determine whether the facts warranted a medical-malpractice action. *Kubrick*, 444 U.S. at 123–24.

## CONCLUSION

A tort claim against the United States "shall be forever barred" if it is not presented to the appropriate federal agency within two years of its accrual. 28 U.S.C. § 2401(b). Ms. Garcia's claim accrued shortly after A.H.G. was born in August 2015. Ms. Garcia's administrative claim was not submitted to HHS until June 2018, well over two years after the claim had accrued.

For the foregoing reasons, the United States requests that the court dismiss Ms. Garcia's complaint with prejudice.

Dated this 20th day of August, 2021.

ANDREA T. MARTINEZ
Acting United States Attorney

*/s/ Melina Shiraldi*
MELINA SHIRALDI
Assistant United States Attorney