IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RUBI GARCIA, individually and on behalf of her minor child, A.H.G., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:19-cv-00416-CW-DBP <br><br> Judge Clark Waddoups |

Before the court is the United States' motion for summary judgment. (ECF No. 20.) After considering the parties' briefing and argument, and considering the evidence submitted for and against the motion, and for the reasons set forth herein, the court grants summary judgment in the United States' favor on the grounds that Plaintiff Rubi Garcia's claim is untimely.

## **Introduction**

Ms. Garcia has brought this suit, on behalf of her daughter, A.H.G., against the United States under the Federal Tort Claims Act (FTCA). Ms. Garcia claims that A.H.G was injured during her birth due to the purported negligence of Dr. Keith Horwood, who delivered A.H.G. Dr. Horwood is a physician employed by Community Health Centers, Inc. ("CHC"), which is funded, in part, through a grant from the United States Department of Health & Human Services ("HHS"). As a grant recipient, CHC is deemed to be a "Health Center" under 42 U.S.C. §

254(b)(1) and CHC and Dr. Horwood are deemed to be federal employees under 42 U.S.C. § 233(g).

Because CHC and Dr. Horwood are deemed to be federal employees, Ms. Garcia's exclusive remedy for alleged medical malpractice is to bring suit against the United States under the FTCA. *See* 28 U.S.C. § 1346(b); 42 U.S.C. § 233(a) & (g).

In the current motion, the United States seeks summary judgment against Ms. Garcia, arguing that Ms. Garcia failed to properly submit her claim to the appropriate agency within two years of its accrual as required by the FTCA. Ms. Garcia does not dispute that she failed to submit her claim within two years of discovering A.H.G.'s injury, but argues that the FTCA's limitations requirement should, nevertheless, not apply to bar her claim.

Ms. Garcia raises two grounds for extending the FTCA's limitations period in this case. First, she argues that because A.H.G. is a minor, the time required by the FTCA for a claim to be submitted should be tolled until A.H.G. reaches the age of majority. Second, Ms. Garcia argues that the FTCA's limitations requirement should be extended under the continuous treatment doctrine.

For the reasons discussed below, the court concludes that neither of the bases raised by Ms. Garcia are sufficient to extend the time for filing an administrative claim in this case. Accordingly, the court grants summary judgment.

## **Factual Background**

A.H.G. was delivered by Dr. Horwood on August 18, 2015 at the University of Utah Hospital. Prior to A.H.G.'s birth, Ms. Garcia had received prenatal care at the 72nd Street Clinic, a CHC affiliated health clinic located in Midvale, Utah, but had not received any care relating to

her pregnancy of A.H.G from Dr. Horwood. (*See* Def.'s Ex. B, ECF No. 21 at 25[1] (identifying providers of prenatal care).) Ms. Garcia had earlier received prenatal care from Dr. Horwood at CHC, but only in connection with her pregnancy with a previous child. (*See* Def.'s Ex. R, ECF No. 30-1 at 2-3.) At the time of A.H.G.'s birth, Dr. Horwood was a Family Physician and the Associate Director/Director of Provider Development for CHC. (*See* C.V. of Dr. Keith Horwood, ECF No. 29 at 1.)

During delivery, A.H.G. experienced shoulder dystocia, which is a condition in which her shoulder became stuck on her mother's pelvis, impeding the delivery. (*See* Dep. of Dr. Keith Horwood at 11:19-12:2; 39:4-40:25, Def.'s Ex. D, ECF No. 21.) After performing standard maneuvers, Dr. Horwood was able to free A.H.G.'s shoulder to allow A.H.G. to be delivered. (*Id*. at 38:16-39:1; 47:13-48:3.)

A.H.G.'s father, Alejandro Hernandez, was present during his daughter's delivery and has testified that he witnessed Dr. Horwood pulling on A.H.G.'s shoulder during the delivery. (Dep. of Alejandro Hernandez at 7:13-19; 10:6-12:6, Def.'s Ex. E, ECF No. 21.)

After A.H.G. was delivered, she was taken to the nursery for examination. (Horwood Dep. at 68:17-69:6.) During that examination, medical personnel observed minimal movement in A.H.G.'s right arm, which is consistent with a brachial plexus injury. (*See* WBN/ICU Admission H&P Notes, Def.'s Ex. F, ECF No. 21 at 80.) The brachial plexus is a group of nerves that emerge from the spinal cord and carry motion and sensory signals from the spinal cord to and from the arm. A brachial plexus injury occurs when one or more of the nerves are stretched or

---

[1]     Page references in this memorandum decision will refer to the page numbers assigned by CM/ECF when each document was filed with the court and that appear at the top of each page.

torn. This can result in temporary or permanent loss of strength and motion in the arm, a condition known as Erb's palsy. (*See* Mot. at 4 n.3, ECF No. 20.)

When A.H.G. was returned to her parents from the nursery, her parents both noticed that A.H.G's right arm appeared to be injured. (*See* Dep. of Rubi Garcia at 23:20-25, Def.'s Ex. A; Hernandez Dep. at 13:15-19.) Medical personnel told Ms. Garcia that they would schedule an appointment for A.H.G. to begin therapy treatments for her right arm. (Garcia Dep. at 24:7-23.)

After returning home from the hospital, Mr. Hernandez told Ms. Garcia that he had witnessed Dr. Horwood pulling on A.H.G.'s shoulder during her delivery and believed this was the cause of her injury. (Garcia Dep. at 30:1-18; Hernandez Dep. at 15:8-16:3.)

On August 20, 2015, Dr. Jay Moreland, a CHC physician at the 72nd Street Clinic, referred A.H.G. for occupational therapy. (*See* ECF No. 29 at 60.) An updated referral for occupational therapy was requested from CHC on January 6, 2017, which was provided by Christian Hyer, a physician's assistant at the 72nd Street clinic. (*See* ECF No. 29 at 94.)

In the months following her birth, A.H.G. participated in therapy to improve the function of her arm. (Garcia Dep. at 26:21-28:9; Occupational Therapy Evaluation Report, Def.'s Ex. G, ECF No. 21 at 83-86.) And on February 3, 2016, A.H.G. underwent surgery, which involved harvesting nerve segments from A.H.G.'s lower legs and grafting them along A.H.G.'s injured brachial plexus nerves with the goal of improving the transmission of nerve impulses to her right arm. (*See* Discharge Summary, Def.'s Ex. J, ECF No. 21 at 93-95.)

Shortly after A.H.G.'s surgery, on or around February 15, 2016, Ms. Garcia retained counsel to pursue potential legal remedies on behalf of A.H.G. relating to her injury. (*See* Identification of Counsel, Def.'s Ex. K, ECF No 21 at 97.) In doing so, Ms. Garcia signed

documents authorizing disclosure of A.H.G's medical information to her attorneys and authorizing the University of Utah Hospital and the 72nd Street Clinic to release records regarding A.H.G.'s treatment. (*See id*.; Authorization to Disclose Medical Info., Def.'s Ex. L, ECF No. 21 at 99; Authorization for Release of Info., Def.'s Ex. M, ECF No. 21 at 101-102.) Ms. Garcia's counsel faxed a copy of the medical release forms to the University of Utah Hospital and a request for records relating to A.H.G.'s treatment on March 29, 2016. (*See* Def.'s Ex. N, ECF No. 21 at 104-107.)

On or around July 17, 2017, approximately a month before A.H.G.'s second birthday, Ms. Garcia's counsel prepared a document entitled "Notice of Claim and Notice of Intent to Commence Action" that was directed to the University of Utah Hospital & Clinics, the University of Utah, and the State of Utah (hereinafter "July 2017 Notice of Claim"). (*See* Pl.'s Ex. 2, ECF No. 29 at 3-6.)  The July 2017 Notice of Claim indicates that it was to be filed with Utah's Division of Occupational and Professional Licensing ("DOPL"). (*Id*.)

The July 2017 Notice of Claim describes the circumstances of A.H.G's birth and her brachial plexus injury but makes no mention of either Dr. Horwood or CHC. (*Id*.) Instead, the July 2017 Notice of Claim alleges that it was the University of Utah Hospital's staff that were responsible for A.H.G.'s injuries. (*See id*.)

On October 13, 2017, more than two years after A.H.G.'s birth, Ms. Garcia's counsel filed an amended notice of claim (the "October 2017 Amended Notice of Claim") that named, for the first time, CHC and Dr. Horwood as respondents allegedly responsible for A.H.G.'s injuries. (Def.'s Ex. O, ECF No. 21 at 109-113.) Like the July 2017 Notice of Claim, the October 2017 Amended Notice of Claim was directed to Utah's DOPL. (*Id*.)

On November 22, 2017, the United States Department of Health & Human Services ("HHS") sent a letter to Ms. Garcia's counsel informing him that it had learned of the notice of claim filed against CHC and advising him that, because CHC was a federally supported Health Center, the FTCA constituted the exclusive remedy against CHC and its employees. (*See* Def.'s Ex. P, ECF No. 21 at 115-116.) The letter also advised Ms. Garcia's counsel that the FTCA required that an administrative claim be filed with the appropriate federal agency within two years of the claim's accrual and that, as of the date of the letter, no administrative claim had been filed on behalf of Ms. Garcia and A.H.G. (*Id.*) A standard form provided for filing an administrative claim under the FTCA was enclosed with the letter. (*Id.*)

On June 14, 2018,  Ms. Garcia's counsel submitted a claim form to HHS on behalf of Ms. Garcia and A.H.G. describing A.H.G.'s injury and alleging that the cause of the injury was Dr. Horwood's delivery. (Def.'s Ex. Q, ECF No 21 at 118-119.) HHS did not take action on Ms. Garcia's administrative claim within six months of its submission to HHS. (See Compl. at ¶ 10, ECF No. 2; Answer at ¶ 10, ECF No. 12.)

On June 18, 2019, Ms. Garcia filed the current action against the United States and Dr. Horwood. (Compl., ECF No. 2.) The parties later agreed to dismiss Dr. Horwood by stipulation on September 4, 2020, leaving the United States as the sole remaining Defendant in the case. (See Stip. for Dismissal, ECF No. 9; Order for Dismissal, ECF No. 10.)

## Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant

has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986) (citation omitted). When applying the summary judgment standard, the court must

"view the evidence and make all reasonable inferences in the light most favorable to the

nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir.

2008).

<u>**Analysis**</u>

The United States seeks summary judgment on Ms. Garcia's sole claim under the FTCA

on the grounds that it is barred by Ms. Garcia's failure to submit an administrative claim to HHS

within two years of its accrual, as required by 28 U.S.C. § 2401(b).

Ms. Garcia does not dispute that she failed to submit an administrative claim to HHS

within two years of discovering A.H.G.'s injury. She argues, however, that Section 2401(b)'s

limitations period should be extended as a result of (1) A.H.G.'s minority and (2) the continuous

treatment doctrine.

The United States argues that Section 2401(b)'s requirement that an administrative claim

be submitted within two years of a claim's accrual is not subject to tolling on the basis of

A.H.G.'s minority. Moreover, it argues that, assuming the continuous treatment doctrine could

be applied to extend Section 2401(b)'s limitations period, Ms. Garcia has not come forward with

facts sufficient to demonstrate that she is entitled to invoke the doctrine.

**I.      Ms. Garcia Did Not Submit her Administrative Claim within Two Years of
Discovering A.H.G.'s Injury.**

28 U.S.C. § 2401(b) provides, in relevant part, that "[a] tort claim against the United

States shall be forever barred unless it is presented in writing to the appropriate Federal Agency

within two years after such claim accrues . . . ." A claim generally accrues under the FTCA when

"the plaintiff has discovered both his injury and its cause." *Arvayo v. United States*, 766 F.2d

1416, 1419 (10th Cir. 1985) (quoting *United States v. Kubrick*, 444 U.S. 111, 120 (1979)).

Here, there is no dispute that Ms. Garcia was aware of the injury to A.H.G.'s arm shortly

after A.H.G.'s birth on August 18, 2015. Both Ms. Garcia and Mr. Hernandez testified in their

depositions that they noticed that A.H.G.'s arm was injured when she was returned to their care

after her examination in the nursery immediately after A.H.G.'s birth. And Ms. Garcia testified

that medical personnel at the hospital told her that A.H.G. would need to undergo therapy for her

arm injury while she was still at the hospital.

There is also no dispute that Ms. Garcia was aware of the purported cause of A.H.G.'s

injury shortly after A.H.G.'s birth. Mr. Hernandez testified that he witnessed Dr. Horwood pull

on A.H.G.'s shoulder during the delivery process and that he believed that was the cause of

A.H.G.'s injury. And Ms. Garcia testified that Mr. Hernandez told her about his belief that Dr.

Horwood caused the injury shortly after returning home from the hospital.

Because Ms. Garcia was aware of A.H.G's injury and its alleged cause on the day of

A.H.G.'s birth, August 18, 2015, Section 2401(b) required her to submit her administrative claim

to the appropriate federal agency on or before August 18, 2017.

Ms. Garcia did not submit her claim to HHS until June 14, 2018, nearly ten months after

the time for submission of a claim under Section 2401(b) had lapsed. Accordingly, unless Ms.

Garcia can establish some basis for extending Section 2401(b)'s limitations period, her FTCA claim must be dismissed.

## II.      Section 2401(b)'s Limitations Period Was Not Tolled by A.H.G.'s Minority.

Ms. Garcia first argues that her claim should not be barred as a result of her failure to submit her claim to HHS within two years of discovering A.H.G's injury, because Section 2401(b)'s limitations requirements should be tolled until A.H.G. reaches the age of eighteen.

Before deciding whether Ms. Garcia's tolling argument has any merit, the court must first determine whether it has jurisdiction to consider an untimely claim under the FTCA at all. In the past, the Tenth Circuit has held that because the limitations requirements of Section 2401(b) constitute a condition of the United States' waiver of its sovereign immunity under the FTCA, Section 2401(b) operates as a restriction on the court's subject matter jurisdiction and must be strictly complied with. *See Barnes v. United States*, 776 F.3d 1134, 1143 (10th Cir. 2015) (applying circuit precedent holding that "timeliness is one of the conditions of the government's waiver of sovereign immunity under the FTCA, and, accordingly, a federal court lacks subject matter jurisdiction to proceed under the FTCA if a plaintiff fails to satisfy the FTCA's timing requirements set forth in § 2401(b)") (internal quotation marks and citation omitted). As a result, the court held that FTCA claimants cannot "avail themselves of the doctrines of equitable estoppel or equitable tolling in seeking to excuse [an] otherwise tardy lawsuit." *Id*. at 1148.

Shortly after *Barnes* was decided, however, the Supreme Court issued its decision in *United States v. Kwai Fun Wong*, 575 U.S. 402, 420 (2015), which held that Section 2401(b) does not impose a jurisdictional bar on untimely FTCA claims and that suits brought under the FTCA are subject to equitable tolling.

While it appears that the Tenth Circuit has not yet directly considered the impact that the *Wong* decision has had on its prior precedent, the Supreme Court's decision is contrary to and invalidates the analysis underlying *Barnes* and thus constitutes an intervening decision that this court must follow. *Cf. United States v. Brooks*, 751 F.3d 1204, 1209 (10th Cir. 2014) (circuit panel not barred from overturning prior circuit precedent "when the Supreme Court issues an intervening decision that is 'contrary' to or 'invalidates our previous analysis.'") (citation omitted). Therefore, Section 2401(b)'s limitations requirements do not impose a bar on this court's subject matter jurisdiction and may be subject to tolling in some circumstances.

Because Congress has provided an express statute of limitations for FTCA claims, determining whether Section 2401(b) is subject to tolling is a question of federal, rather than state, law. *See Franklin Savings Corp. v. United States (In re Franklin Savings Corp.)*, 385 F.3d 1279, 1288 (10th Cir. 2004) ("[A] court looks to state law to define the time limitation applicable to a federal claim only when Congress has failed to provide a statute of limitations for a federal cause of action, but Congress has expressly stated the applicable limitation period for a tort claim brought against the United States, in § 2401(b), so reference to state law is inappropriate.") (citation and internal quotation marks omitted); *Pipkin v. U.S. Postal Serv.*, 951 F.2d 272, 274-75 (10th Cir. 1991) ("We do not agree that the state tolling provision in this case enlarges the time provided by Congress for filing a federal tort claim. The general rule is that a court looks to state law to define the time limitation applicable to a federal claim only when Congress has failed to provide a statute of limitations for a federal cause of action.") (internal quotation marks and citation omitted).

Determining whether Section 2401(b)'s limitations period is subject to tolling, then, is a question of statutory construction. As with any question of statutory constriction, the court begins by considering the statute's text, which provides:

> (b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b).

Notably absent from Section 2401(b) is any reference to tolling of the limitations periods described therein. In contrast, Section 2401(a), which imposes a six-year statute of limitations on non-tort suits against the United States, includes an explicit basis for tolling based on a claimant's legal disability. The statute states that "[t]he action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases." 28 U.S.C. § 2401(a).

The government argues that by omitting the tolling language that appears in Section 2401(a) from section 2401(b), Congress, by negative implication, intended to exclude legal disability as a basis for tolling the limitations periods that apply to claims under the FTCA. (*See* Reply at 3-4, ECF No. 30.) The court agrees.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 22-23 (1983) (alteration in original). *See also United States v. Jefferson*, 989 F.3d 1173, 1176-77 (10th Cir. 2021). Thus, by including legal disability as a basis for tolling the limitations period

applicable to non-tort suits against the United States under Section 2401(a), but omitting it as a basis for tolling the limitations period applicable to the FTCA under Section 2401(a), Congress expressed its intent that Section 2401(b)'s limitations periods not be subject to tolling on the basis of legal disability. *See Booth v. United States*, 914 F.3d 1199, 1205 (9th Cir. 2019) (citing *United States v. Glenn*, 231 F.2d 884, 886 (9th Cir. 1956)) ("Congress did not intend that the sentence in § 2401(a) qualified the limitation on tort claims set forth in § 2401(b).") (internal quotation marks and alterations omitted).

On this basis, federal courts, including the Tenth Circuit, have consistently held that Section 2401(b) is not subject to minority tolling. *See*, *e.g.*, *Robbins v. United States*, 624 F.2d 971, 972 (10th Cir. 1980) (citing *Glenn*, 231 F.2d 884) ("It is well established . . . that a claimant's minority does not toll the running of the statute of limitations under the Federal Tort Claims Act."); *Booth*, 914 F.3d at 1205 ("We have never recognized minority tolling for the FTCA's statute of limitations.") (citations omitted); *Santos ex rel. Beato v. United States*, 559 F.3d 189, 197 (3d Cir. 2009) ("[W]e agree with the Government that the statute of limitations was not tolled due to Santos's status as a minor.") (internal quotation marks and alterations omitted); *Leonhard v. United States*, 633 F.2d 599, 624 (2d Cir. 1980) ("It is firmly established that the [FTCA's two-year limitations period] is not tolled by a claimant's minority.") (citations omitted). *See also* 15A James Wm. Moore et al., *Moore's Federal Practice* § 105.26[3.1][a] (2024) ("[An administrative claim under the FTCA] must be presented to the appropriate federal agency within two years after the claim accrues or it is forever barred. This two-year period is not ordinarily tolled on the basis of the claimant's minority.") (citing cases).

Thus, Ms. Garcia cannot rely on A.H.G.'s minority status alone to toll Section 2401(b)'s limitations period. Instead, she argues that A.H.G's status as a minor constitutes an extraordinary circumstance that warrants equitable tolling in this case.

In *Wong*, the Supreme Court held that, despite the absence of any explicit tolling provision, Section 2401(b)'s limitation periods could be extended under the doctrine of equitable tolling under appropriate circumstances. The Court reasoned that there was a rebuttable presumption that equitable tolling should apply "to suits brought against the United States under a status waiving sovereign immunity." 575 U.S. at 407-408. *See also Lozano v. Montoya Alvarez*, 572 U.S. 1, 12 (2014) ("Congress is presumed to incorporate equitable tolling into federal statutes of limitations because equitable tolling is part of the established backdrop of American law.").

The doctrine of equitable tolling allows the court to "pause the running of a limitations statute . . . when a party has pursued his rights diligently but some extraordinary circumstance prevents him from meeting a deadline." *Id*. at 407-408 (citation and internal quotation marks omitted). Thus, to show that she is entitled to equitable tolling to excuse her failure to submit her administrative claim within two years of her discovery of A.H.G.'s injury, Ms. Garcia must show (1) that she was diligent in pursuing her claim before Section 2401(b)'s limitations period lapsed and (2) that some extraordinary circumstance prevented her from complying with Section 2401(b)'s requirements.

### A.      A.H.G's Minority Status Alone Is Not an Extraordinary Circumstance.

Ms. Garcia argues that A.H.G.'s status as a minor, when considered in light of Utah's strong interest in protecting the legal rights of minor litigants, constitutes an extraordinary circumstance that warrants equitable tolling in this instance.

In support, Ms. Garcia cites *Albright v. Keystone Rural Health Center*, 320 F. Supp. 2d 286 (M.D. Pa. 2004). Like this case, *Albright* concerned a claim brought on behalf of a child that was allegedly injured during birth as a result of a purportedly negligent delivery. *Id*. at 287. The child's mother first brought her claim, on behalf of the child, in Pennsylvania state court. *Id*. HHS intervened and removed the case to federal court, asserting that the defendants in the state case were deemed federal employees and covered by the FTCA. *Id*. Defendants then moved to dismiss the case for lack of subject matter jurisdiction, arguing that the plaintiff failed to exhaust her administrative remedies before filing suit and that an administrative claim was time barred under Section 2401(b). *Id*.

The district court disagreed and held that the existence of Pennsylvania's minority tolling statute, "coupled with the fact that it was difficult if not impossible to ascertain Defendants' federal status[,] gave rise to an extraordinary circumstance that prevent Plaintiffs from both timely filing their claim and pursuing available administrative remedies." *Id*. at 290-91. Thus, the court applied equitable tolling and denied the defendants' motion to dismiss. *Id*. at 291.

Importantly, however, *Albright* did not hold that the claimant's minority status alone provided a basis for equitable tolling. Instead, it was the combination of the claimant's minority status and the unusual difficulty in ascertaining the treating physician's federal status that warranted extending the limitations period on equitable ground. *See Santos*, 559 F.3d  at 203

(explaining that *Albright* applied equitable tolling where "*combination* of Pennsylvania's minors' tolling statute and difficulty of ascertaining federal status of defendants resulted in extraordinary circumstances precluding plaintiff from timely filing her claim") (emphasis added). Important to the court's analysis in *Albright* was the fact that a claimant who was prevented from discovering a defendant's federal status could reasonably rely on Pennsylvania's minority tolling statute when deciding when to file a claim in state court, making it unfair to bar such a claim when the plaintiff later discovered that minority tolling was unavailable. *See* 320 F. Supp 2d at 290 ("[I]n cases where the Pennsylvania Minors' Tolling Statute applies, that statute will often permit more than the traditional two years to bring claim under state law. Thus, if the minor plaintiff, like his or her adult counterpart, is unaware that the cause of action is against a federal entity, that plaintiff would be unfairly penalized if not allowed to pursue a claim, because state law has acted to bring the claim outside the federal statute of limitations.").

While Ms. Garcia claims that, like in *Albright*, it was difficult to ascertain Dr. Horwood and CHC's status as deemed federal employees in this case, she has failed to present sufficient evidence to support that contention. As discussed in more detail below, Dr. Horwood and CHC's federal status could have been fairly easily discovered had Ms. Garcia exercised due diligence in preparing her claim. Thus, *Albright* does not support application of the equitable tolling doctrine in this case where there is no evidence that it was unusually difficult to ascertain Dr. Horwood's or CHC's federal status.

Aside from the basis for tolling outlined in *Albright*, the Court recognizes that particular circumstances related to a claimant's minority status may provide other bases for applying equitable tolling. For example, in *Booth*, the Ninth Circuit suggested that equitable tolling may

be appropriate where (1) "a minor is abandoned by his parents and/or guardians and so left unprotected;" (2) "a minor is a ward of the state without a next friend of guardian . . . or has a guardian of his person with interests possibly adverse to his own;" or (3) "the cause of action is not reasonably knowable by the plaintiff or her parents because of her minority." 914 F.3d at 1207 (citations and internal quotation marks omitted).

Ms. Garcia has not presented evidence in this case, however, of any particular circumstances that made it unusually difficult to bring a timely claim on behalf of A.H.G. In the absence of such evidence, the court cannot find that extraordinary circumstances exist for tolling the FTCA's limitation requirements based on A.H.G.'s status alone.

Ms. Garcia also argues that extraordinary circumstances should be found in this case because of the paramount importance that Utah courts have placed on protecting the interests of minority claimants. In support, Ms. Garcia cites the Utah Supreme Court's decision in *Lee v. Gaufin*, 867 P.2d 572 (Utah 1993). In *Lee*, the Utah Supreme Court held that a provision in the Utah Health Care Malpractice Act that expressly prohibited application of Utah's minority tolling statute to toll the statute of limitations on medical malpractice claims brought by or on behalf of minors that are injured at birth was unconstitutional under the Utah Constitution's uniform operation of laws clause. *Id*. at 589. The court reasoned that, because minors have no legal capacity to bring suit in Utah, and because parents and guardians have no legal duty to "assert or otherwise protect a minor's legal claims," the statute's bar on minority tolling discriminated against minor claimants by terminating their right to a remedy "before the minor reaches his or her majority and before the minor has a reasonable opportunity to assert the action." *Id*. at 577-80.

Ms. Garcia argues that *Lee* demonstrates that minor claimants have a substantive right, under the Utah Constitution, to tolling of a statute of limitations until the age of majority. (*See* Opp. at 10, ECF No. 25.) And because minority tolling is a substantive right under the Utah constitution, Ms. Garcia argues that A.H.G.'s minority constitutes an extraordinary circumstance in light of 28 U.S.C. § 1346(b), which has been construed to mean that the United States should be held liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances." *Id.* at 6.

The court agrees with Ms. Garcia that *Lee* recognizes a substantive right under the Utah Constitution to minority tolling in some circumstances. But it is not clear to the court that the holding of *Lee* is as expansive as Ms. Garcia suggests. It is true that much of the *Lee* opinion is written with broad language that would seem to apply to any claim brought by a minor. In the conclusion, however, the Utah Supreme Court appeared to cabin its holding to the narrow circumstance where "the right of a minor who is injured at birth is placed in particular jeopardy because the injury may not be detectable until after the limitations periods have expired." *Lee*, 867 P.2d at 589. Further, the court recognized that it may be possible for the legislature to enact a statute of limitations that is applicable to a minor's claim in other circumstances if "procedures were adopted that assured that a minor's legal claim could be litigated notwithstanding the neglect, abandonment, or indifference of parents or caretakers." *Id.* Thus, it does not appear that *Lee* can be read to grant a categorical right to minority tolling based solely on a claimant's status as a minor.

To the extent that *Lee* holds only that the Utah Constitution bars strict application of a statute of limitations to bar a claim belonging to a minor who has not had a reasonable

opportunity to pursue the claim, then the court does not view *Lee's* holding as being inconsistent with the federal doctrine of equitable tolling, which would apply to toll Section 2401(b)'s limitation period where particular circumstances relating to a claimant's minority status unfairly prevented discovery or pursuit of a claim under the FTCA. As discussed above, however, Ms. Garcia has not shown that such circumstances exist in this case.

Furthermore, even if the court were to assume that *Lee* recognized a broad right to minority tolling under the Utah Constitution, as Ms. Garcia appears to contend, it does not follow that such a right must be applied to toll Section 2401(b)'s limitation period. While Ms. Garcia is correct that Section 1346(b)(1) requires that "[s]tate substantive law applies to suits brought against the United States under the FTCA," *see Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004), Ms. Garcia cites no authority to support the conclusion that Section 1346(b) requires application of a state tolling rule to extend the limitations period provided in Section 2401(b). To the contrary, courts have held that while Section 1346(b) requires courts to apply state substantive law when determining liability under the FTCA, "its statute of limitations provisions are governed by federal law, not state" and "state law tolling statutes do not apply to the FTCA statute of limitations." *See Morales-Melecio v. United States (Dep't. of Health and Human Servs.)*, 590 F.3d 361, 365 n.9 (1st Cir. 2018) (citing cases).

Thus, even if *Lee* is construed to grant a broad substantive right to minority tolling under the Utah Constitution, the court would not be required to apply it in this case unless it gave rise to  some extraordinary circumstance that prevented Ms. Garcia from complying with Section 2401(b)'s requirements.

Ms. Garcia has not identified any basis for concluding that Utah's supposed recognition of minority tolling as a substantive right prevented her from filing her administrative claim within the two-year period required by Section 2401(b). Thus, the fact that Utah may have a significant interest in protecting the rights of minority claimants does not give rise to extraordinary circumstances that would support application of equitable tolling in this case.

The court recognizes that this may create a situation where a minor claimant may be barred from bringing a claim against the United States that could otherwise be brought in state court against a private defendant. But that result will occur any time a state's statute of limitations or tolling rules differ from those applicable to the FTCA. Such circumstances have never been recognized as a basis for equitable tolling. If it were, the FTCA's statute of limitation would be rendered superfluous.

### B.   Ms. Garcia Could Have Discovered Dr. Horwood and CHC's Federal Status with Reasonable Diligence.

Even if the court were to assume that A.H.G.'s status as a minor constituted an extraordinary circumstance that prevented Ms. Garcia from submitting her administrative claim within Section 2401(b)'s two-year limitations period, Ms. Garcia would still need to show that she was diligent in pursuing her claim to qualify for equitable tolling. *See Wong*, 575 U.S. at 407-408.

Ms. Garcia contends that she was diligent in pursuing her claim because she filed the July 2017 Notice of Claim, which alleged negligent conduct by employees of the University of Utah Hospital, with Utah's DOPL on July 17, 2017, which was within the two-year limitations period imposed by Section 2401(b). Ms. Garcia claims that she believed, at the time, that Dr. Horwood

was an employee of the University of Utah Hospital[2] and that her filing of the 2017 Notice of Claim shows that she was actively pursuing her claim before the limitations period lapsed.

The undisputed evidence, however, shows that with reasonable diligence Ms. Garcia and her counsel could have easily discovered that Dr. Horwood was employed by CHC, that Dr. Horwood and CHC were deemed to be federal employees, and that the FTCA was the exclusive remedy available for Dr. Horwood's alleged malpractice long before Section 2401(b)'s limitations period lapsed.

Although Ms. Garcia never received medical treatment from Dr. Horwood at a CHC clinic in connection with A.H.G's birth, she did meet with and receive care from Dr. Horwood at a CHC clinic in connection with an earlier pregnancy in 2011. (*See* Reply at Ex. R (Progress Notes), ECF No. 30-1.) And even if Ms. Garcia did not recall the care she previously received from Dr. Horwood at a CHC clinic in 2011, the evidence shows that information contained in the documents Ms. Garcia's counsel received from the University of Utah Hospital and CHC's 72nd Street Clinic, as well as publicly available information that was easily accessible online, would have revealed that Dr. Horwood was affiliated with CHC and that CHC was a federal grant recipient.

Ms. Garcia and her attorneys were aware that Ms. Garcia had received pre- and post-natal care from CHC's 72nd Street Clinic in February 2016 when Ms. Garcia signed a document authorizing the 72nd Street Clinic to release medical records to her attorneys. (*See* Mot. at Ex. L,

---

[2]    While Ms. Garcia claims that she directed the 2017 Notice of Claim only to the University of Utah Hospital because she believed Dr. Horwood was an employee of the hospital, the 2017 Notice of Claim does not mention Dr. Horwood by name or allege that the University of Utah Hospital was his employer. (*See* Mot. at Ex. L, ECF No. 21 at 99.)

ECF No. 21 at 99.) Ms. Garcia's and her counsel's awareness that Ms. Garcia had received pre- and post-natal care at the 72nd Street Clinic should have caused Ms. Garcia's counsel to investigate whether Dr. Horwood was affiliated with CHC, rather than assume he was an employee of the University of Utah Hospital.

If Ms. Garcia's counsel had investigated the identity of Dr. Horwood's employer before Section 2401(b)'s limitations period lapsed, the undisputed evidence shows that Dr. Horwood's affiliation with CHC could have been discovered by a review of the documents Ms. Garcia's counsel received from the University of Utah Hospital or through a simple internet search. A delivery note from the University of Utah Hospital's records, for example, identified Dr. Horwood as the physician that delivered A.H.G.[3] and referred to him as the "CHC physician who delivered the infant." (*See* Mot. at Ex. C, ECF No. 21 at 33-36.)

Moreover, the government has submitted evidence, which has been undisputed by Ms. Garcia, that CHC maintained a website at all times relevant to this case that identified Dr. Horwood as a physician at CHC's Oquirrh View Clinic. (*See* Reply at Ex. S, ECF No. 30-2.) Each page of CHC's website also disclosed that CHC is a "Health Center Program grantee under 42 U.S.C. 254b, and a deemed Public Health Service employee under 42 U.S.C. 233(g)(n)." (*See id.*)

---

[3]    Ms. Garcia's counsel initially claimed at oral argument that the records received from the University of Utah Hospital did not identify Dr. Horwood as the physician who attended to Ms. Garcia during A.H.G.'s birth, but later acknowledged that he had misspoke and that the University of Utah Hospital's records did identify Dr. Horwood as the physician who delivered A.H.G. The record shows that Dr. Horwood was identified as the physician who delivered A.H.G. in several documents produced by the University of Utah Hospital. (*See, e.g.*, ECF No. 21 at 21-36, 77-81; ECF No. 29 at 69-71.)

The evidence shows that Dr. Horwood's affiliation with CHC, and Dr. Horwood and CHC's status as deemed federal employees, could have been discovered by Ms. Garcia's counsel with a simple internet search. There is no evidence, however, that Ms. Garcia or her counsel conducted such a search. Nor is there any evidence that Ms. Garcia or her counsel contacted CHC, the University of Utah Hospital, or Dr. Horwood to confirm his employer or federal status within the limitations period.

At oral argument, Ms. Garcia's counsel argued that to establish an entitlement to equitable tolling Ms. Garcia only needed to show that she diligently pursued her claim, not that she diligently investigated it, pointing to the Third Circuit's decision in *Santos*. But *Santos* did not apply equitable tolling in the absence of a diligent investigation by counsel. To the contrary, the court in *Santos* held that counsel, "who requested and reviewed [his client's] medical records, [and] visited, corresponded with, and performed a public records search on York Health," had conducted a diligent investigation. 559 F.3d at 198.

A diligent pursuit of a medical malpractice claim necessarily involves an investigation into the identity of the treating physician and their legal status. Several courts have refused to apply equitable tolling in FTCA malpractice cases where a claimant failed to diligently investigate a medical provider's status as a deemed federal employee on the grounds that the claimant failed to meet the equitable tolling doctrine's diligence requirement. *See, e.g.*, *D.J.S.-W by Stewart v. United States*, 962 F.3d 745, 752-54 (3d Cir. 2020) (declining to apply equitable tolling where counsel "failed to take reasonable steps to confirm Dr. Gallagher's employment status"); *Arteaga v. United States*, 711 F.3d 828, 835 (7th Cir. 2013) ("Had the plaintiff's lawyer's in the present case exercised proper diligence yet failed to uncover Erie's federal status,

she would have an argument for equitable tolling. . . . None of them did.") (citations omitted); *Gonzalez v. United States*, 284 F.3d 281, 291 (1st Cir. 2002) (declining to apply equitable tolling where plaintiff and her attorneys "simply assumed that this was a state case and failed to make any inquiries whatsoever to confirm their assumption"). *Cf. A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 146 (2d Cir. 2011) (noting that HHS provides a "toll-free number and a publicly available database through which a plaintiff can ascertain the federal nature of the relevant defendant" and rejecting the notion that equitable tolling should be applied "whenever an FTCA plaintiff is unaware of the federal nature of the defendant").

Because Ms. Garcia has failed to come forward with evidence showing that she or her attorneys conducted a diligent investigation into the federal status of Dr. Horwood or CHC, she cannot qualify for application of the equitable tolling doctrine to save the untimely submission of her administrative claim to HHS.

## III.   The Continuous Treatment Doctrine Does Not Apply.

Finally, Ms. Garcia argues that the limitations period set forth in Section 2401(b) should be tolled by the continuous treatment doctrine.

Under the continuous treatment doctrine, some federal courts have held that "where there has been a course of continuous medical treatment, a [medical malpractice] claim may not accrue until the end of that course of treatment, if the treatment has been for the same illness or injury out of which the claim for medical malpractice arose." *Otto v. Nat'l Inst. of Health*, 815 F.2d 985, 988 (4th Cir. 1987). *See also Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1080 (2d Cir. 1988) ("[A] number of courts-including our own-have recognized that where the plaintiff is in the continuing care of the negligent actor for the same injury out of which the FTCA cause of

23

action arose, the statute of limitations may be tolled under certain circumstances until the end of the course of treatment.") (citations omitted).

There are generally two rationales for application of the continuous treatment doctrine. Under one rationale, courts conclude that "it is not reasonable to expect a patient who is in the continuing care of a doctor to discover that the doctor's acts may be the cause of his injuries." *Ulrich*, 853 F.2d at 1080. This conclusion is motivated by several assumptions regarding the doctor-patient relationship, including that negligent doctors may have an incentive to conceal information about their negligence from their patients and that a patient might feel inhibited from questioning their doctor's care during the court of treatment. *Id*. Under this rationale, the doctrine appears to be nothing more than an application of the discovery rule recognized by the Supreme Court in *Kubrick*. 444 U.S. at 113 (holding that FTCA claim for medical malpractice accrues "when the plaintiff knows both the existence and the cause of his injury"). And courts applying it decline to apply the doctrine once a claimant has actual knowledge of the injury and probable cause underlying their claim. *See Outman v. United States*, 890 F.2d 1050, 1053 (9th Cir. 1989) (citing *Ashley v. United States*, 413 F.2d 490, 492 (9th Cir. 1969)) ("[T]he continuous-treatment doctrine was not available to toll the statute of limitations in medical malpractice cases under the FTCA where the plaintiff knows of the acts constituting the negligence.").

The second rationale for applying the continuous treatment doctrine does not depend on obstacles to discovery of a claimant's injury and its probable cause. Instead, courts applying this rationale hold that it is "absurd to expect a patient being treated by a doctor or hospital to interrupt corrective treatment by instituting suit against either while under their continuing care." *Ulrich*, 853 F.2d at 1081. These courts reason that the doctor-patient relationship is one that must

24

be built on trust, and that "[w]here corrective treatment is needed, it often would be so plainly contrary to the patient's own interests in his cure and recovery to disrupt his relationship by serving a summons and complaint on those caring for him as to make the requirement to sue nonsensical." *Id*.

While the Tenth Circuit has made a couple of fleeting references to the continuous doctrine in prior cases, it has never adopted the doctrine or applied its rationale. *See Espinoza v. United States*, 85 F.3d 640 (10th Cir. 1996) (declining to apply continuous treatment doctrine where claimant did not receive continuous treatment); *Bradley v. U.S. by Veterans Admin.*, 951 F.2d 268, 271 (10th Cir. 1991) (citing *Outman*, 890 F.2d at 1053) ("continuous-treatment doctrine" is not available to toll the FTCA statute of limitations when plaintiff knows what acts caused the alleged injury).

The court recognizes that the more narrow construction of the continuous treatment doctrine would be applicable to defer accrual of a medical malpractice claim under the FTCA to the extent a doctor's continuing treatment prevents a claimant from discovering their injury or its cause. As noted above, this construction of the continuous treatment doctrine is merely an application of *Kubrick's* discovery rule.

The narrow construction of the continuous treatment doctrine, however, does not help Ms. Garcia in this case, since it is undisputed that she was aware of A.H.G.'s injury, and its alleged cause, shortly after A.H.G. was born—more than two years before she submitted her administrative claim to HHS.

Accordingly, it is only the more liberal construction of the continuous treatment doctrine that could possibly save Ms. Garcia's untimely claim, and Ms. Garcia urges the court to apply it in this case.

The court has serious doubts about whether the more liberal construction of the continuous treatment doctrine should be applied to the FTCA. While Ms. Garcia has cited some non-precedential cases from federal courts that have applied the broadest version of the continuous treatment doctrine to extend the FTCA's limitations period, the court has been unable to find any legal reasoning in those decisions to explain how application of the continuous treatment doctrine to defer accrual of an FTCA claim beyond the date of discovery of the claimant's injury would be consistent with the plain language of Section 2401(b). Regardless of the policy merits underlying the more liberal construction of the continuous treatment doctrine, the court is obligated to apply Section 2401(b) as it was written by Congress. There is nothing in the plain language of Section 2401(b) that would support application of the continuous treatment doctrine to extend Section 2401(b)'s limitations period beyond the date of discovery. Nor has Ms. Garcia cited any authority demonstrating that Congress intended the doctrine to be applied when it enacted Section 2401(b).

When the Supreme Court recognized the applicability of the equitable tolling doctrine in FTCA cases, it did so on the basis of a presumption that Congress incorporates equitable tolling into federal statutes of limitations "because equitable tolling is part of the established backdrop of American law." *Lozano*, 572 U.S. at 12. The court is not convinced that the continuous treatment doctrine has a comparable established history in American law that would justify a

presumption that Congress intended it to be incorporated into the FTCA's limitation provisions without saying so.

Nevertheless, for the sake of argument in this case, the court will assume that the more liberal construction of the continuous doctrine applies and consider whether Ms. Garcia has come forward with sufficient evidence to create a genuine dispute of material fact regarding its application in this case.

In support of her contention that the facts support applying the continuous treatment doctrine to extend Section 2401(b)'s limitations period in this case, Ms. Garcia relies heavily on a 2001 decision from the District of New Mexico—*Stephenson ex rel. Stephenson v. United States*, 147 F. Supp. 2d 1106 (D.N.M. 2001). In *Stephenson*, the court adopted and applied the more liberal reading of the continuous treatment doctrine[4] based on a "common-sense appeal to the idea that patients should be encourage to follow a course of treatment for a period of time, without poisoning the physician-patient relationship by investigating possible malpractice or filing a claim." *Id*. at 1111.

---

[4]    In reviewing prior case law on the continuous treatment doctrine, the court in *Stephenson* suggested that the liberal construction of the continuous treatment doctrine had been adopted by the Second, Fourth, and Eighth Circuits, while the doctrine had been rejected, or limited to only its narrow application in cases where the claimant's injury and its cause had not been discovered, by the Third and Ninth Circuits. *See Stephenson*, 147 F. Supp. 2d at 1111. It appears that the court in *Stephenson* was mistaken about the Eighth Circuit's application of the doctrine, since the Eighth Circuit only applies the doctrine when "the entire course of treatment [is] negligent." *See McCoy v. United States*, 264 F.3d 792, 795 (8th Cir. 2001) (noting that the circuit has rejected the liberal form of the doctrine adopted in *Otto* and *Ulrich*). Thus, it appears that the liberal version of the continuous treatment doctrine has only been applied in the Second and Fourth Circuits, and a majority of circuit courts that have adopted the doctrine have refused to apply it in its broadest form.

Similar to this case, *Stephenson* involved a claim brought on behalf of a minor child that incurred a brachial plexus injury during his birth. *Id*. at 1107-08. The child was born in a military hospital, so the child's mother brought suit against the United States under the FTCA alleging that the child's injury was caused by the negligence of the doctor that delivered the child, Dr. Carroll. *Id*. Dr. Carroll was also the child's primary care physician. *Id*.

After the child's birth, Dr. Carroll referred the child to a civilian specialist and civilian physical therapist for treatment of the brachial plexus injury. *Id*. Because he was the child's primary care physician, Dr. Carroll was required to provide authorization for visits to and treatment by the civilian specialist and also had to authorize the course of physical therapy treatment received by the child. *Id*. at 1112. Dr. Carroll received updates from the civilian specialist treating the child after each visit. *Id*. Moreover, Dr. Carroll continued to examine the child's arm and made records regarding his examinations when the child would come to him for other complaints and check-ups. *Id*.

Based on this evidence, the court concluded that Dr. Carroll was involved in a continuous course of treatment of the child's brachial plexus injury and that Section 2401(b)'s limitations period was therefore tolled until the child stopped seeing Dr. Carroll after moving to a different city. *Id*. The court, applying the more liberal version of the continuous treatment doctrine, reasoned that requiring the child's mother to file her claim while Dr. Carroll was still the child's primary care physician might endanger the referrals that the child needed to get therapy and other treatment. *Id*. Thus, the court concluded that Dr. Carroll had continued direct involvement in evaluating the child's progress and control over the child's treatment by other health-care

providers. *Id*. Accordingly, the court held that the continuous treatment doctrine applied, despite the involvement of other physicians in the child's treatment.

Even assuming that it correctly applied the continuous treatment doctrine to extend Section 2401(b)'s limitations period, *Stephenson* is distinguishable from the case at hand. Unlike in *Stephenson*, it is undisputed that Dr. Horwood's treatment of A.H.G. ended when A.H.G. was born and that Dr. Horwood did not exercise any control over A.H.G.'s treatment after that time.[5] Thus, A.H.G. did not receive any continuing treatment from Dr. Horwood after her birth and the continuous treatment doctrine would not apply to extend Section 2401(b)'s limitations period, even if the court were to adopt the liberal reasoning of the court in *Stephenson*.

Ms. Garcia appears to argue[6] that the involvement of other CHC medical providers in the treatment of A.H.G.'s brachial plexus injury also supports application of the continuous treatment doctrine. But Ms. Garcia has cited no authority to support application of the doctrine to treatment provided by doctors other than the physician that allegedly caused the injury based

---

[5] Ms. Garcia argues that Dr. Horwood "continued his power and control over A.H.G.'s care through his leadership role in the CHC as a medical director." (*See* Opp. at 16, ECF No. 25.) Ms. Garcia, however, has provided no evidence that Dr. Horwood's role as an Associate Medical Director and Director of Provider Development at CHC gave him any authority to control the course of treatment received by A.H.G. in connection with her brachial plexus injury. Nor has she come forward with any evidence that Dr. Horwood kept himself apprised of the progress of A.H.G.'s injury, or was involved in any way in its treatment, after A.H.G.'s birth. In the absence of any such evidence, no reasonable jury could agree with Ms. Garcia's assertion's regarding Dr. Horwood's continued control over A.H.G.'s treatment, which appear to be based on nothing but speculation.

[6] It is unclear from Ms. Garcia's briefing whether her continuous treatment doctrine argument depends on the assertion that Dr. Horwood exercised continuing supervisory control over other CHC medical providers, or whether Ms. Garcia contends that the continuous treatment doctrine would apply regardless of Dr. Horwood's involvement. As noted above, Ms. Garcia has not presented any evidence that Dr. Horwood exercised any supervisory control over other CHC medical providers that were involved in A.H.G.'s treatment.

merely on their affiliation with the same clinic. The policy rationale for applying the doctrine to extend Section 2401(b)'s limitations period beyond the date of discovery is substantially weaker when the physician who purportedly caused the injury is no longer involved in the treatment. There is no reason to believe that Ms. Garcia felt inhibited in pursuing A.H.G.'s claim because of a desire to maintain trust with CHC after Dr. Horwood was no longer involved in A.H.G.'s treatment. And there is no reason to believe that CHC would have withheld necessary treatment if Ms. Garcia began pursuing A.H.G.'s claim prior to the end of the course of A.H.G.'s treatment. Indeed, the evidence shows that Ms. Garcia did begin pursuing A.H.G.'s claim before A.H.G.'s treatment was complete when she hired counsel in February 2016. CHC was aware of Ms. Garcia's retention of counsel when it received a request for records relating to A.H.G.'s injury. There is no evidence that Ms. Garcia's retention of counsel interfered in any way with A.H.G.'s continuing treatment.

Even if there were authority supporting application of the continuous treatment doctrine where other doctors affiliated with the same clinic as the purportedly negligent doctor provided treatment, the evidence that CHC medical personnel continued to exercise control over A.H.G.'s treatment is sparse. Ms. Garcia points to the fact that an occupational therapist requested two referrals from CHC, seventeen-months apart, before treating A.H.G. as evidence of CHC's continuing control.[7] But Ms. Garcia has presented no evidence to show that such referrals were

---

[7]     Ms. Garcia claims in her opposition that notes from A.H.G.'s occupational therapist indicate that A.H.G. was referred by Dr. Horwood, who was A.H.G.'s primary care physician. But there is no dispute that Dr. Horwood was not A.H.G.'s primary care physician and that A.H.G. was referred to occupational therapy by CHC providers other than Dr. Horwood. The erroneous reference to Dr. Horwood in A.H.G.'s occupational therapy notes has no relevance to application of the continuous treatment doctrine in this case.

necessary, or that A.H.G. would not have received treatment if the referral had not been made. In *Stephenson*, the court found that Dr. Carroll was "*required* to provide authorization for the specialist's treatment" and "*had to* authorize the course of physical therapy [the child] went through." 147 F. Supp, 2d at 1112. There is no evidentiary basis to find that referrals were required in this case.

Ms. Garcia also claims that CHC "continued to keep itself updated regarding A.H.G.'s brachial plexus injury," citing a single clinical note from A.H.G.'s visit to Christian Hyer, a Physician's Assistant at CHC, nine months after A.H.G. was born. In the note, Mr. Hyer notes that A.H.G. was recovering from surgery, that her condition was improving, and that her mother was doing daily exercises with her. (*See* ECF No. 29 at 86.)

Unlike in *Stephenson*, there is no evidence that CHC medical personnel received regular updates from other physicians and therapists treating A.H.G.'s brachial plexus injury. Indeed, in the single progress note cited by Ms. Garcia, discussed in the previous paragraph, there is no indication that Mr. Hyer had any communications with A.H.G.'s other medical providers at all. Nothing in the note identifies the source of the information regarding A.H.G.'s surgery and progress, and it is plausible that the information came from Ms. Garcia. And there is no evidence that CHC providers continued to monitor the progress of A.H.G.'s brachial plexus injury after May 2018.

The court concludes that Ms. Garcia has not submitted sufficient evidence to allow a reasonable jury to find that medical personnel at CHC exercised continued control over treatment for A.H.G.'s brachial plexus injury after her birth. Thus, even if the continuous treatment doctrine could be applied based on the involvement of CHC medical personnel other than Dr.

Horwood in A.H.G.'s treatment, Ms. Garcia has failed to come forward with evidence sufficient to support such an application.

Accordingly, the court concludes that no version of the continuous treatment doctrine can be applied in this case to extend the limitations period set forth in Section 2401(b).

## Conclusion

For the reasons stated herein, the court concludes that Ms. Garcia's claim is barred as a result of her failure to file an administrative claim with the appropriate federal agency within the period required by 28 U.S.C. § 2401(b) and, accordingly, grants summary judgment in favor of the United States.

DATED this 19th day of March, 2024.

BY THE COURT:

Clark Waddoups
United States District Judge